UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CYNTHIA LAETZ,
*as the personal representative of the
estate of* Dr. Brian Laetz,

      Plaintiff,

v.

HYUNDAI MOTOR AMERICA and
HYUNDAI MOTOR COMPANY,

      Defendants.
_____/

Case No. 1:12-cv-204

HON. JANET T. NEFF

**OPINION**

    Plaintiff filed this wrongful death/product liability action in Calhoun County Circuit Court, following her son's death in an automobile accident involving a Hyundai Elantra. Defendants removed the case to this Court. Pending before the Court is Defendants' Motion for Summary Judgment (Dkt 95). Plaintiff has filed a Response (Dkt 98), and Defendants have filed a Reply (Dkt 97). Having fully considered the parties' submissions, the Court concludes that oral argument would not assist in the disposition of the issues presented. *See* W.D. Mich. LCivR 7.2(d) (the Court has discretion to schedule oral argument or dispose of a dispositive motion without argument at the end of briefing). For the reasons that follow, Defendants' motion is denied.

**I. Factual Background**

    Plaintiff was the registered owner of a black, four-door 2002 Hyundai Elantra (the "Elantra" or the "vehicle"), which she purchased new from Fox Motor Group (JSMF[1] ¶ 4). On Thursday,

---

[1]The parties have filed a Joint Statement of Material Facts (JSMF) (Dkt 96).

March 18, 2010, at about 6:07 p.m., her 33-year-old son Brian was driving the Elantra northbound on Interstate 69, north of Verona Road, in Calhoun County, Michigan when the vehicle left the road, going off the right shoulder, then back onto the highway, across the northbound lanes and median, and hit a 2001 Freightliner FLC-120 pulling a loaded 2005 Wabash Trailer in the southbound lane of I-69 (*id.* ¶¶ 5-8; 9/9/13 Dynamic Analysis Group Report "DAG Report," Defs. Ex. 1, p. 2). The right front of the Elantra contacted the left front of the Freightliner (JSMF ¶ 9). The Elantra's shock tower and left front tie rod were fractured in the accident (*id.* ¶¶ 10-11). Brian died as a result of the accident.

Plaintiff filed this action alleging three counts: negligence and negligent design/manufacture (Count I); false representation/breach of implied warranty (Count II); and wrongful death (Count III) (*see* Second Am. Compl., Dkt 17). Plaintiff contends that a defect in the front suspension lower control arm of the Elantra, which was the subject of a safety recall, caused the loss of control of the car and the fatal accident. Defendants assert that the uncontroverted evidence establishes that the accident was caused by Brian's inattentive driving. Defendants now move for summary judgment.

## II. Summary Judgment Standard

A moving party is entitled to a grant of its motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). The court must consider the evidence and all reasonable inferences in favor of the nonmoving party. *Burgess v. Fischer,* 735 F.3d 462, 471 (6th Cir. 2013); *U.S. S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (citation omitted).

The moving party has the initial burden of showing the absence of a genuine issue of material fact. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 200 (6th Cir. 2010). The burden then "shifts to the nonmoving party, who must present some 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson,* 477 U.S. at 248). "There is no genuine issue for trial where the record 'taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Burgess,* 735 F.3d at 471 (quoting *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson,* 477 U.S. at 251-52).

### III.  Analysis

Defendants contend they are entitled to judgment as a matter of law "because Plaintiff cannot make the requisite showing of product liability negligence or breach of implied warranty under Michigan law" (Defs. Brf., Dkt 95 at 1). "Without producing evidence of a defect in the subject vehicle, or being able to prove that the alleged defect caused the injuries to Plaintiff's decedent, Plaintiff cannot establish a prima facie product liability case" (*id.*). Further, because Plaintiff's wrongful death claim (Count III) is derivative of her failed product liability claims, that claim fails as well (*id.* at 24).

Although the parties raise numerous legal and evidentiary issues in their briefs, the essential dispute is whether there are genuine issues of material fact concerning a defect in the Elantra and whether the defect caused the fatal accident. "In order to establish a prima facie case of product liability, the plaintiff must show 'that the defendant supplied a product that was defective and that

the defect caused the injury.'" *Rodger v. Ford Motor Co.*, No. 275578, 2008 WL 4646140, at *2 (Mich. Ct. App. 2008) (setting forth various product liability theories and claim elements) (quoting *Auto Club Ins. Ass'n v. Gen. Motors Corp.*, 552 N.W.2d 523, 527 (Mich. Ct. App. 1996)). "'[T]he burden to prove a defect and a causal connection to the injury always remains with the plaintiff. The defendant never has the burden to prove a non-defect.'" *Id.* at *4 (quoting *Monte v. Toyota Motor Corp.*, Nos. 220671, 220983, 2001 WL 1152901, at *3 (Mich. Ct. App. Sept. 28, 2001)).

Defendants cite their expert report as uncontradicted evidence that Brian was driving northbound on I-69 when "he drifted onto the right shoulder, overcorrected, and sent the car into an uncontrollable yaw across the northbound lanes, across the median, and, tragically, into a fully loaded southbound Freightliner tractor trailer" (Defs. Brf. at 1, citing DAG Report, Defs. Ex. 1, pp. 7-9). Thus, although Plaintiff alleges that a recall condition on the Elantra's lower left front control arm caused the loss of control and the accident, the indisputable physical evidence proves otherwise—that Brian's inattentive driving caused his death (Defs. Brf. at 1). Contrary to Defendants' arguments, Plaintiff has produced sufficient evidence of a defect and causation to withstand Defendants' summary judgment motion.

The parties agree that Michigan law applies in this case. They do not agree, however, on the legal principles that govern the claims or on the admissibility of evidence presented. For instance, Defendants assert that Plaintiff's response brief contains a misstatement of Michigan law with respect to product liability/implied warranty claims (Defs. Reply, Dkt 97 at 1).[2] Regardless of the

---

[2]Defendants characterize Plaintiff's response brief as a "hodgepodge" (Defs. Reply at p. ID# 1244), a characterization with which the Court agrees. Plaintiff's brief presents a conglomeration of legal principles, application, and evidentiary-issue arguments. Defendants' briefs, while thorough, are not without shortcomings; for instance, Defendants' Reply references an attached "Standard Jury Instruction" as an accurate statement of the applicable law—however, no instruction

parties' different formulations of the legal principles, and their views on the admissibility of evidence with respect to the various liability theories, the parties' fundamental dispute—concerning the evidence of a defect and causation—persuades the Court that genuine issues of material fact preclude summary judgment.

It is undisputed that prior to Brian's accident, in April 2009, Honda Motor Company (HMC) issued a voluntary recall on certain 2001–2003 model year Elantra (XD) vehicles after consumer complaints of front control arm failures and an investigation by the National Highway Traffic Safety Administration (NHTSA) Office of Defects Investigation (ODI) (*see* ODI Resume, Pl. Ex. 1; Hyundai-Kia Recall Letter, Pl. Ex. 2; Recall 09V-125 Campaign Announcement, Defs. Ex. 3). Because some Elantras experienced corrosion in the front suspension lower control arms, the Recall directed dealerships in the salt belt states, including Michigan, to "inspect[] [the control arm] for salt induced corrosion and treat[] with rust-proofing material" (NHTSA's Hyundai Recall Campaign Announcement, Defs. Ex. 3, p. 2). Plaintiff testified that she received a notice of the recall four days before Brian's accident, and she contacted Brian that evening (Pl. Dep., Defs. Ex. 4, p. 7; Pl. Ex. 7, pp. 7-9). Brian contacted the Hyundai dealership and was informed that the recall issue did not present a safety issue, and a recall appointment was set for Friday, March 19, 2010, the day after the fatal crash (Pl. Dep, Pl. Ex. 7, p. 10).

A key dispute is whether a failure of the left front control arm caused Brian to lose control of the Elantra and crash into the semi-truck. Defendants contend that all the physical evidence "proves that the control arm remained attached to the left front wheel and functioned throughout the

---

is attached to the brief, nor is a specific instruction cited. Given the inadequate briefing, the Court concludes that the resolution of such legal disputes is premature, and regardless, is unnecessary to the disposition of the instant motion.

crash" (Defs. Brf. at 5). Defendants cite their Expert Report, which concludes that "[t]he left front lower control arm did not cause Mr. Laetz to drive off the road; none of the crash evidence is consistent with that type of component failure" (*id.*, citing DAG Report, Defs. Ex. 1, p. 9). Defendants argue that Plaintiff's experts do not support her contention that a defect in the lower left control arm existed prior to the crash.

      Plaintiff has submitted evidence from three experts: Blaine Danley, metallurgist; Richard Hathaway, automotive engineer; and Gary McDonald, an accident reconstructionist, to support her claims. Defendants acknowledge that: (1) Danley opined that the "lower left control arm on the subject vehicle fractured prior the collision" (Defs. Brf. at 5, citing Danley 5/3/11 Report, Defs. Ex. 5, p. 2); and (2) Hathaway likewise opined that the left front control arm "failed prior to impact" (*id.*, citing Hathaway 3/21/11 Report, Defs. Ex. 7, p. 23). However, Defendants challenge the validity of these opinions from various standpoints, asserting for instance, that Danley's testimony is relevant only on the question of defect and that he does not claim to have knowledge of the function of the lower control arm and has never operated a vehicle with a damaged or fractured lower control arm (Defs. Brf. at 5-6). Further, Danley based his analysis solely on his "observations" of the "appearance of the fracture surface" (*id.* at 6, citing Danley Dep., Ex. 6, p. 37). Defendants note that Danley has "no modeling knowledge" of the component, cannot say what "maneuver directions" would have resulted in the deformations he observed, and considers it outside his expertise to opine on what caused the separation of the control arm from the vehicle (*id.* at 6, citing Danley Dep. at 51, 54, 66-67).

      Defendants similarly attack the validity of Hathaway's opinion, asserting that he based his conclusion on a post-crash analysis of "the corrosion" in the control arm, but he admits that he did

6

not do "extensive measurement[s]" on the left lower control arm, and that his finite element analysis (FEA) modeling was "[n]ot intended to replicate what happened" in Brian's crash (Defs. Brf. at 6-7, citing Hathaway Dep., 8/15/13 and 9/27/13, Ex. 8, pp.78, 226-27).  Defendants note that their expert, Dr. Vogler, explains in detail that Dr. Hathaway's claimed reliance on an FAE is improper because he has provided no foundation for the analysis (Defs. Brf. at 6 n.1).  Defendants also assert that Hathaway's and Danley's opinions on how the Elantra's control arm separated contradict each other. For example, with regard to Separation Mode of the Control Arm, Defendants state:

> **Dr. Hathaway** has opined that the left front lower control arm partially or fully separated as the vehicle was traveling northbound on I-69 from a tensile overload of the lower portion of the arm and a **tearing of the top surface**, which he attributes to a **bending failure** initiated by an off-axis column buckling.  He further opined that "it was **not a fatigue issue**" and "fatigue was not the issue of failure". [(*See also* Hathaway Dep. at 729:19-130:11).]  **Mr. Danley, however**, opined that a **fatigue crack initiated on the bottom surface** of the left front lower control arm, grew until the crosssection could not support the vehicle weight, and fracture occurred.  He further opined that the area where this fatigue crack initiated "has **little to no plastic deformation (bending)**". [(*See also* Danley Dep. at 7:10-7:24).]

(Defs. Brf. at 7 (footnote omitted) (emphasis in Defs. Brf).

Defendants also argue that Plaintiff's experts' contradictory and speculative belief that a pre-crash component failure is within the "definite framework of possibility" is insufficient as a matter of law to support her claims (Defs. Brf. at 8, citing *Maricco v. Meco Corp.*, No. 03-71719, 2004 WL 6081574, at *11 (E.D. Mich. Sept. 3, 2004) ("a plaintiff cannot create a genuine issue of material fact merely by pointing to an injury suffered while using the defendant's product")).

Despite Defendants' multi-based attacks on Plaintiff's experts' opinions, the Court does not find the opinions wholly undermined or devoid of evidentiary value on the disputed issues.  The evidence in this case is undoubtedly complex and highly technical, both as to the alleged component

failure and causation. Plaintiff's experts' reports cannot be parsed so specifically to defeat her product liability claims on summary judgment.

Despite the shortcomings and distractive tangential argument in Plaintiff's brief, the evidence cited, viewed as a whole, persuades the Court that Plaintiff's claims are not subject to dismissal for lack of evidentiary support. Plaintiff cites the NHTSA ODI Resume, which summarized Defendants' self-admitted description of the purported control arm defect, pursuant to 49 C.F.R. § 573.6(c)(5), as follows:

> According to Hyundai, **road salt can collect** in the outboard portion of the front lower control arm and **may result in internal corrosion leading to thinning of the steel in the lower control arms**. The **corrosion may progress** to the point where the lower control arm upper and lower panels become perforated. A **perforated front lower control arm may fracture** between its ball joint attachment and the forward and rearward pivot attachments to the chassis. This could affect the **driver's control over the tire and wheel assembly**.

(Pl. Brf. at 7, quoting NHTSA 4/21/09 ODI Resume, Pl. Ex. 3, p. 1 & Defs. 4/14/09 Defect Information Report, Pl. Ex. 2a, p. 2) (emphasis in Pl. Brf.).

Plaintiff details evidence supporting the existence of a defect associated with the front lower control arm in the Elantra and supporting causation, including her experts' reports and testimony, and evidence of consumer complaints and other incidents involving front lower control arm failures.[3] Danley, Plaintiff's metallurgical expert, testified that the ODI Resume was in keeping with his own opinion that the corrosion involved in the front lower control arm may progress and perforate the

---

[3]Plaintiff notes that "[o]ut of (85) total substantially similar incidents having occurred up until the date of the accident, (73) involved failure of the front lower control arm with a resultant loss of driving control. The great majority of such incidents took place at low speeds, without warning, and without involving an impact with another vehicle or object. (*See* http://www-odi.nhtsa.dot.gov/owners/SearchSafetyIssues at safercar.gov - Ex. 6.) (Pl. Brf. at 12 n.7).

front lower control arm, and could ultimately lead to fracture (Danley Dep., Pl. Ex. 4, pp. 28-30). He also noted that the investigation instructed dealers to measure the thickness of the steel in the front lower control arm, with possible replacement, which he opined was indicative of a concern over thinning of the material (*id.* at 29, 31). He opined that the report's noting of the need for "additional holes in the upper and lower control panels" indicated that "it was likely a crevice corrosion issue" (*id.* at 31-32). Danley prepared a report summarizing his findings from a metallurgical evaluation on the fractured front lower control arm of the Elantra, finding three significant features on the fracture surface. He stated that the fracture surfaces showed "areas along the fracture surface where the metal ha[d] suffered extensive corrosion," and thinning of the metal (Danley 5/3/11 Report, Pl. Ex. 5 at 1; Danley Dep., p. 10). He further explained:

> The corrosion that occurred in this part appears to be a form of crevice corrosion due to the design of the part. Although plastic deformation in the area of the fracture contributes to the reduced thickness, this deformation is not the primary cause of the reduced metal thickness. It is well recognized that corrosion and the resulting reduction of metal thickness leads to initiation sites for fatigues cracks.

(Danley 5/3/11 Report, p.1). Danley further found that some areas of the fracture surface had "extensive plastic deformation" (*id.*). He explained that "[t]hese areas are where final fracture occurred after the fatigue crack had grown large enough so that the remaining metal of the lower control arm could no longer support the applied load," and this deformation was in "an upward direction, which indicates that the final fracture occurred as a result of the lower control arm not being able to support the weight of the vehicle" (*id.*). Based on his findings, Danley concluded that the control arm on the Elantra fractured prior to the collision and the cause of the fracture was a fatigue crack initiated by corrosion of the lower control (*id.*, p. 2).

Plaintiff also cites Hathaway's report, which states:

> The left front control arm provides the lateral support for the outer pivot (lower ball joint) which transfers braking and cornering loads from the wheel to the vehicle frame structure. If the lower control arm fails[,] any loads in the horizontal plane (braking, cornering or even due to the suspension springs and shocks [)] will allow the wheel to move unpredictably, creating a situation which could cause the driver to lose control.

(Pl. Brf. at 16-17, quoting Hathaway 3/21/11 Report, Pl. Ex. 8, p. 2). Based on his expert analysis, Hathaway concluded that the left front control arm had failed prior to impact (Hathaway 3/21/11 Report, p. 22).

Finally, Plaintiff cites the expert report and testimony from McDonald, Plaintiff's accident reconstruction consultant, who determined that the 2002 Hyundai, traveling between 68-81 mph, had (1) "left the travel lane of I-69"; (2) "crossed partly onto the paved shoulder and grassy area on the east side of I-69," and "the right side tires paralleled the grassy area while the left side tires traveled on the paved shoulder"; (3) "[i]t appears that the left side tire marks on the shoulder area were tire scuffing marks"; and (4) "[t]he left tire marks on the shoulder could have been caused during a steering maneuver or a left front steering defect of the control arm" (Pl. Brf. at 19-22, citing McDonald Report, Pl. Ex. 13). McDonald determined that "once the vehicle re-entered the main travel lanes of I-69[,] it was in a yawing maneuver," and "[t]he vehicle yawed across the highway to the left," ultimately colliding with the semi-tractor unit (*id.*). McDonald's analysis, coupled with the reports and testimony of Plaintiff's other experts, Danley and Hathaway, adequately supports Plaintiff's contentions that a defect in the front lower control arm of the Elantra caused Brian's accident.

In short, the expert reports and testimony in this case present highly technical and complex determinations, which are directly at odds, raise genuine issues of material fact, and are not properly

resolved on summary judgment. The Court has fully reviewed the record and the contentions of both sides, and no clear conclusions can be drawn at this juncture concerning the proof that a defect in the Elantra either caused, or did not cause, Brian's fatal accident. Defendants' attacks on Plaintiff's experts hinge in large part on the weight accorded to the expert opinions and the experts' credibility, neither of which is properly considered by the Court on summary judgment.

To the extent Defendants challenge the admissibility of the evidence presented by Plaintiff, the Court is not persuaded that the evidence is clearly inadmissible with respect to the claims and theories of liability at issue—so as to be wholly discounted based on the preliminary arguments and authority cited in the motion briefs. However, these issues will be revisited by Court should this case proceed to trial. There is ample indication in this case that Plaintiff's legal theories and the concomitant evidentiary issues are in dire need of further scrutiny and refinement.

Viewing the evidence and all reasonable inferences in favor of Plaintiff, Plaintiff has presented sufficient evidence to survive summary judgment of her claims. The evidence is not "so one-sided" that Defendants must prevail as a matter of law. *See Back*, 694 F.3d at 575.

### IV. Other Remaining Claims and Issues

The parties have previously raised and briefed the issues of (1) the viability of Plaintiff's Wrongful Death Act claim as a separate cause of action, and (2) hedonic damages (Dkts 78, 81, 82). The Court makes no final determinations on these matters. To the extent Plaintiff's wrongful death claim is derivative of its product liability claims, it likewise survives summary judgment. Any issues of damages will be reserved pending trial.

### V. Conclusion

Although a number of evidentiary and other issues remain for decision should this case

proceed to trial, it cannot be said that the record, taken as a whole, could not lead a rational trier of fact to find for Plaintiff with respect to the claims alleged. *See Burgess,* 735 F.3d at 471. Accordingly, Defendants' Motion for Summary Judgment is denied. An Order will be entered consistent with this Opinion.


Dated: September  8 , 2014                         /s/ Janet T. Neff
                                                   JANET T. NEFF
                                                   United States District Judge